**L. Paul DIEFFENBACH, Jr., Appellant,**

v.

**ATTORNEY GENERAL OF VERMONT, Hazel M. Stevenson, Robert B. Young, First National Bank of Orwell, Inc., Appellees.**

No. 902, Docket 78–7507.

United States Court of Appeals, Second Circuit.

Argued May 7, 1979.

Decided Aug. 8, 1979.

---

L. Paul Dieffenbach, Jr., pro se.

Michael R. Gadue, Asst. Atty. Gen., Burlington, Vt. (M. Jerome Diamond, Atty. Gen. of Vermont, Montpelier, Vt., of counsel), for appellees Attorney General and Stevenson.

John A. Kelley, Middlebury, Vt., for appellees Young and First National Bank of Orwell, Inc.

1. 12 Vt.Stat.Ann. § 4601 provides:
   When a judgment is for the foreclosure of a mortgage, permission of the court shall be required for review.

2. 12 Vt.Stat.Ann. § 4531a provides:
   When a power of sale is contained in a mortgage and the plaintiff in the complaint,

Before SMITH, OAKES, and VAN GRAAFEILAND, Circuit Judges.

OAKES, Circuit Judge:

Appellant pro se challenges on equal protection and due process grounds the so-called "strict foreclosure" laws of the state of Vermont under which on foreclosure of a real estate mortgage the mortgagee owns the mortgaged property absolutely and need not apply the proceeds of any sale in satisfaction of the mortgage debt. Appellant also seeks to challenge on constitutional grounds a Vermont statute, 12 Vt.Stat. Ann. § 4601,[1] which provides that a defendant (but not a plaintiff) in a foreclosure action needs leave of court to appeal. And he also claims a violation of his right to due process by the failure of a deputy clerk of the Vermont Supreme Court to give him adequate notice of a hearing on the mortgagee's motion to dismiss his appeal from the state foreclosure decree for failure to secure from the lower court the needed permission to appeal. The United States District Court for the District of Vermont, James S. Holden, Chief Judge, granted the defendants' motion for summary judgment. We affirm.

## I. THE FACTS

Appellant purchased certain real estate in Shoreham, Vermont, on February 25, 1974, financing the property with a first mortgage issued by the First National Bank of Orwell, Inc. (the Bank), in the amount of $10,000. The mortgage did not contain a clause providing for a power of sale; indeed, a statute permitting foreclosure by judicial sale in the case of mortgage deeds containing such clauses did not become effective until July 1, 1974.[2] Appellant be-

or the defendant in his answer requests a sale, the court may upon entry of judgment of foreclosure order that the property be sold pursuant to such power and the court may further determine the time and manner of the sale. The plaintiff shall thereupon execute the power of sale and do all things required by it or by the court. . . .

came delinquent in the payments due sometime before December, 1975, and the Bank commenced foreclosure proceedings on January 20, 1976, by filing an action in the Addison Superior Court, together with a motion for summary judgment and a motion to shorten[3] the statutory time of redemption of six months.[4] On February 18, 1976, appellant filed his answer and opposition to the Bank's motions. The Superior Court on April 13, 1976, found no material facts in issue concerning appellant's execution of the mortgage note and his default of payments, granted the Bank summary judgment on its motion for foreclosure, but set down for hearing the amount owing for principal, interest, taxes, insurance, attorney's fees and legal costs, under the terms of the mortgage deed, following Vt.R.Civ.P. 80.1(e). On June 18, 1976, the Superior Court held a hearing on the accounting pursuant to the judgment of foreclosure and found that appellant was indebted to the Bank in the total sum of $11,252, covering principal, interest, taxes, insurance premium, and reasonable attorney's fees, plus interest at the rate of $2.04 per day from the date of the decree to the date of payment. The court gave appellant six months from the date of the decree during which to redeem, *i. e.,* the full, unshortened statutory period, note 4 *supra.*

Appellant's motions to vacate the judgment and to stay the proceedings were denied on December 8 and 20, 1976, respectively. The time for redemption expired on December 18, 1976. On December 22, appellant filed with the Superior Court a notice of appeal from the denials of these motions. In that notice he also appealed to the Supreme Court to consider the constitutionality of "certain statutes" which resulted in the foreclosure judgment, and on January 21, 1977, appellant filed with the Superior Court a memorandum supporting his constitutional challenge to 12 Vt.Stat.Ann. § 4601. By order dated January 25, after argument, the court stated that it did "not find Title 12 § 4601 to be unconstitutional" and directed appellant to post a $5,000 bond on or before February 7, as a condition of perfecting the December 22, 1976, notice of appeal. The appellant did not file the bond but instead on February 7 unsuccessfully applied to the Superior Court to file a second notice of appeal of the January 25, 1977, order. Appellant then filed an original appeal in the Vermont Supreme Court on the issue of the constitutionality of the leave to appeal statute, note 1 *supra.* By order dated March 29, 1977, the Supreme Court denied the original appeal but directed the Addison Superior Court to file appellant's second notice of appeal with the Supreme Court.

Meanwhile, the Addison Superior Court on March 2, 1977, issued a writ of possession to the Bank, and appellant was subsequently evicted from the premises by act of the sheriff.[5] Appellant then filed on April 21,

---

12 Vt.Stat.Ann. §§ 4532 & 4533 provide for procedures in the case of a judicial sale. These articles were all enacted by 1973 Vt. Acts No. 226 (Adj.Sess.), effective July 1, 1974.

Another statute, enacted in 1973, provides for judicial sale where federal law prohibits strict foreclosure. 12 Vt.Stat.Ann. § 4531. It is not involved in this case.

On the question whether a private power of sale could exist at common law, see note 13 *infra.*

**3.** A motion to shorten the period of redemption afforded the mortgagor must be filed with the foreclosure complaint. Vt.R.Civ.P. 80.1(d).

**4.** The statutory period of redemption afforded a mortgagor after the date of entry of judgment of foreclosure is six months for mortgages exe-

cuted as was appellant's after April 1, 1968, and one year for those executed before that date. *See* 12 Vt.Stat.Ann. § 4528, 1967 Vt. Acts No. 367 § 4; Reporter's Notes to Vt.R. Civ.P. 80.1.

**5.** This was in accordance with 12 Vt.Stat.Ann. § 4528 which provides:

If a decree is made foreclosing the right of redemption, the time of redemption shall be six months from the date of the decree unless a shorter time be ordered. If the premises are not redeemed agreeably to the decree, the clerk of the court may issue a writ of possession. Such writ shall have the same force and effect and be executed in the same manner as similar writs issued after judgment by a court of law in ejectment proceedings.

1977, a motion to stay judgment with the Vermont Supreme Court. This motion was set for hearing on April 29, 1977, and the Bank filed a motion to dismiss the appeal on April 27, 1977. The clerk of the Supreme Court mailed notice of the Bank's motion to appellant on April 27, together with notice that the second motion would also be heard on April 29.[6] Appellant appeared before the Supreme Court on April 29, 1977, and the court proceeded to deny his motion to stay and grant the Bank's motion to dismiss for lack of jurisdiction, presumably because appellant had not complied with the Superior Court's conditions for leave to file the second appeal, i. e., filing a bond.

■ In October, 1977, the Bank sold the property to a third person for $20,000. The Bank was entitled to sell because the period for redemption had expired on December 8, 1976, and the Bank had been installed in possession of the premises by virtue of the writ issued on March 2, 1977,[7] so that it could deliver both legal title and possession to a purchaser.[8] Under Vermont law, once the period for redemption has expired following a decree of foreclosure and the mortgagee has lawfully acquired full legal title, it need not repay the mortgagor any excess sum recovered from a subsequent sale of the property over the amount owing on the mortgage.[9]

Appellant filed suit in the United States District Court for the District of Vermont on March 17, 1978, against the Vermont Attorney General, the deputy clerk of the Supreme Court, the Addison County sheriff, the Bank, and a Bank officer, Robert D. Young. The court dismissed suit against the sheriff for lack of personal jurisdiction because he was not served with process.

## II.  JURISDICTION

■ Appellees Bank and Young have moved to dismiss the appeal on the ground

---

**6.** In complaining that this notice was inadequate, appellant refers us to Vt.R.App.P. 6. There is no such Rule, however, and he must be referring to Vt.R.Civ.P. 6(e) when he argues that "the fact that a pleading or notice served upon a party is forward [sic] through the mail automatically extends the given time period by three days . . . ."

**7.**  See note 5 supra.

**8.**  Legal title could be delivered because the law treated the legal estate in mortgaged premises as absolutely vested in the mortgagee upon the mortgagor's default in compliance with the condition of the mortgage; until a foreclosure decree, however, the mortgagor was the equitable owner of the fee, with legal title vested in the mortgagee only for the protection of his security interest. Ordway v. Farrow, 79 Vt. 192, 199–200, 64 A. 1116, 1119 (1906); Barrett v. Sargeant, 18 Vt. 365 (1846); Hooper v. Wilson, 12 Vt. 695 (1839); see H. Harmon, Vermont Court Procedure § 173 (1912). By early statute foreclosure in Vermont was by suit in equity, whereby the sum due was ascertained, execution might be stayed, and a time for payment limited after which the "equity of redemption" would expire. Id. As Harmon, the leading Vermont commentator, pointed out:

The Vermont method [of foreclosure] is favorable to the debtor, giving him considerable time in which to pay, with only a moderate addition of costs. While it does not always bring the money promptly to the creditor, he can sell the land at public auction if he desires [or, we would add, at private sale],

after the equity of redemption has been foreclosed.

Id. at 221 n.44.

**9.**  See Perry v. Ward, 82 Vt. 1, 5, 71 A. 721, 722 (1909) (taking possession of property after foreclosure decree becomes absolute operates as purchase of property in satisfaction of debt even though property's value exceeds amount of debt). See also Aldrich v. Lincoln Land Corp., 130 Vt. 372, 376–77, 294 A.2d 853, 855 (1972) ("the right of redemption itself is the device that removes a foreclosure from the condemnation of a forfeiture").

It should be pointed out that a mortgagee who takes possession under a foreclosure decree that has become absolute cannot sue on the debt unless he has established in the foreclosure proceedings that the property is worth less than the debt. "If the security is less in value than the amount of the decree the payment is pro tanto," Bailey v. Groton Mfg. Co., 113 Vt. 288, 290, 34 A.2d 182, 183 (1943); see Calkins v. Clement, 54 Vt. 635, 638 (1881) (chattel mortgage); Paris v. Hulett, 26 Vt. 308 (1854); Lovell v. Leland, 3 Vt. 581 (1831); 1 F. Lawrence, A Treatise on the Substantive Law of Equity Jurisprudence § 215, at 269 (1929). Ordinarily the mortgagee can recover any established deficiency only in a later action at law on the debt. United Savings Bank v. Barber, 135 Vt. 278, 375 A.2d 993 (1977); Hewey v. Richards, 116 Vt. 547, 80 A.2d 541 (1951); Bailey, supra.

that the strict foreclosure of appellant's property does not constitute state action and that we therefore lack subject matter jurisdiction under 28 U.S.C. § 1343 and 42 U.S.C. § 1983.[10] They refer us to the dismissal of a similar suit, brought by this appellant against certain attorneys, police officers, a New Hampshire bank and its officers, and the Attorney General of New Hampshire, *Dieffenbach v. Buckley,* 464 F.Supp. 670 (D.N.H.1979). That suit, challenging the power of sale mortgage foreclosure procedures of New Hampshire, was dismissed by the District Court for the District of New Hampshire for failure to show state action, apparently because the New Hampshire mortgage statutes do not create the power of sale foreclosure but merely serve to regulate and standardize an otherwise recognized practice. The New Hampshire district court cited a number of cases, including *Charmicor, Inc. v. Deaner,* 572 F.2d 694 (9th Cir. 1978), and *Roberts v. Cameron-Brown Co.,* 556 F.2d 356 (5th Cir. 1977), which have held that such a non-judicial foreclosure under a private power of sale does not constitute state action.

Of course, the district court also referred to *Flagg Brothers v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729 (1978), the recent Supreme Court case interpreting the state action requirement in the context of the New York warehouseman's lien. *Flagg Brothers* held that a warehouseman's proposed sale of goods entrusted to him for storage pursuant to his lien over the goods, as authorized by the New York Uniform Commercial Code, was not state action. The Court distinguished *North Georgia Finishing, Inc. v.*

*Di-Chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); and *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), all imposing procedural restrictions on creditors' remedies, by pointing to the failure in *Flagg Brothers* to allege the participation of any public officials in the proposed sale. 436 U.S. at 157, 160 n.10, 98 S.Ct. at 1734. Given "[t]his total absence of overt official involvement," the Court reasoned, state action could be found only if the acts of private parties could fairly be attributed to the state. 436 U.S. at 157, 98 S.Ct. 1729. The Court pointed out that the State of New York had not compelled the sale of the goods but merely had announced the circumstances under which its courts would not interfere with a private sale. "Our cases state 'that a State is responsible for the . . . act of a private party when the State, by its law, has compelled the act.' [*Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 170 [, 90 S.Ct. 1598, 26 L.Ed.2d 142] (1970).] This Court, however, has never held that a State's mere acquiescence in a private action converts that action into that of the State." 436 U.S. at 164, 98 S.Ct. at 1737.

Professor Tribe suggests that in a case such as this, involving constitutional restraints on governmental rules, not on governmental actors, a court should focus not on the private or public status of the actor but on whether the challenged rule of law can validly distribute authority among governmental and private actors as it purports to do.[11] Although such an approach

10. Appellees Bank and Young characterize the jurisdictional question as whether the alleged violations of plaintiff's civil rights occurred under color of state law within the meaning of 42 U.S.C. § 1983. Technically, however, the state action objection refers not to this requirement of § 1983 but to its requirement that the right be "secured by the Constitution and laws" of the United States. To demonstrate that an action is under color of state law, it might be sufficient to show that a private party acted with knowledge of and pursuant to a state statute; but to demonstrate that an individual has been deprived of the Federal Constitutional right to equal protection or due process, it is

necessary to show that state action caused the deprivation. *See Flagg Bros. v. Brooks,* 436 U.S. 149, 155–56, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).

11. In its decision in *Flagg Brothers, Inc. v. Brooks,* the Court continued to elaborate upon the conventional but largely empty categories of state action. . . .

The treatise advanced the argument that constitutional rights should define the characteristics of unconstitutional state action: to the extent that such rights impose restraints on governmental *actors* only, the appropriate question is whether the actors who

might lead to easier analysis, the Supreme Court evidently requires us to determine initially whether there is "overt official involvement." In *Fuentes,* for example, as in *Flagg Brothers,* the state law allowing for ex parte prejudgment replevin had been incorporated into the contract between debtor and creditor but, unlike *Flagg Brothers,* a clerk was required, at the creditor's request, to make out the writ of replevin pursuant to which the sheriff seized the property. Similarly, in *Sniadach* the statute required the clerk of the court to issue the summons at the request of a creditor's lawyer and in *North Georgia Finishing* the court clerk issued the writ of garnishment based solely on an affidavit of the creditor. Although this seems to be a somewhat arbitrary method of differentiation [12] we are bound to apply it. Here, although the private mortgage deed in effect incorporates the Vermont law of foreclosure, the law *does* require a mortgagee to go to court to obtain a decree of foreclosure,[13] which the creditor then must record.[14] The court or the clerk may render an accounting and

the court has discretionary power to extend or limit the statutory period of redemption that follows the decree. Indeed, to obtain possession after the equity of redemption has expired the creditor must obtain from the clerk of the court a writ of possession which the sheriff must execute.[15] Unlike the procedures in other states for non-judicial foreclosure under private power of sale, Vermont's strict foreclosure laws directly engage the state's judicial power in effectuating foreclosure. These official acts are certainly sufficient to give us jurisdiction over the appellant's claim that the strict foreclosure laws of Vermont are unconstitutional.

■ Appellant's other two claims are even clearer instances of state action. In the case of 12 Vt.Stat.Ann. § 4601, the statute requiring him to obtain permission of the Superior Court to appeal, state judges are obviously involved. So, too, in the case of the claim of lack of notice of the Supreme Court hearing on the motion to

---

make a challenged decision are in fact governmental actors or are simply private actors. But to the extent that such rights impose restraints on governmental *rules* and not on governmental actors, the proper question is whether the challenged federal or state rule of law can validly distribute among governmental and private actors as it purports to do. Justice Rehnquist's opinion for the majority in *Flagg Brothers* illustrates the incomprehensible results of the still popular approach to the state action inquiry—an approach which continues to be marked by a single-minded search for the moving hand of a governmental actor in any action challenged as unconstitutional.

L. Tribe, *American Constitutional Law* 105 (Supp.1979) (footnotes omitted).

12. In a footnote, the Court elaborates on the distinction somewhat, reasoning that *North Georgia Finishing* and similar cases involve state action not simply because a clerk issued a ministerial writ "but because as a result of that writ the property of the debtor was seized and impounded by the affirmative command of the law of [the state]." *Flagg Bros. v. Brooks,* 436 U.S. 149, 160–61 n.10, 98 S.Ct. at 1736 (1978). The distinction, so explained, nevertheless is problematic because apparently an automatic ministerial act suffices to transform what would be private action to the "affirmative command" of the state.

13. Even prior to the effective date of 12 Vt. Stat.Ann. § 4531a, *supra* note 2, permitting judicial power of sale provisions in mortgage deeds, the common law of Vermont may have permitted a foreclosure sale if the mortgage deed had so provided, *see Bailey v. Groton Mfg. Co.,* 113 Vt. 288, 291, 34 A.2d 182, 183 (1943); *Roberts v. W. H. Hughes Co.,* 86 Vt. 460, 462, 85 A. 982, 983 (1913); *Wing v. Cooper,* 37 Vt. 169, 183–84 (1864); *see also* G. Osborne, *Handbook on the Law of Mortgages,* § 337, at 726 & n.11 (2d ed. 1970) (absent a statutory prohibition, a power of sale, although unusual, will be effective and will be judicially nullified only in Nebraska). Thus it is possible that appellant could have bargained for an enforceable private power of sale. But he did not do so and was consequently limited to his remedies under Vermont's strict foreclosure law. Those remedies, as we point out in the text, clearly require substantial state involvement. The circumstance that appellant might have been able to insist on a contractual provision that might *not* have implicated state action does not vitiate our conclusion that state action was involved in the foreclosure of his mortgage.

14. 12 Vt.Stat.Ann. §§ 4529–30.

15. 12 Vt.St.Ann. § 4528.

dismiss his appeal, appellant challenges either the omission of the deputy clerk or the act of the Vermont Supreme Court in proceeding to hear the motion; in either case state actors are openly and officially involved.

We therefore hold that all three claims involve state action.

## III. STRICT FORECLOSURE

Appellant's attack on Vermont's strict foreclosure statute is substantive, not procedural. In effect, the laws permit a mortgagee to receive any surplusage remaining after the proceeds from the mortgaged land have been applied in payment of the mortgagee's debt and costs as found in the foreclosure decree. *See* note 9 *supra.* This form of strict foreclosure has been a part of Vermont law from Vermont's earliest days and until 1973 no statute [16] has permitted foreclosure by judicial sale. *See* H. Harmon, *Vermont Court Procedure* § 173, at 221 (1912). Yet interestingly, the state Attorney General appears to concede that strict foreclosure permits the inequitable enrichment of the mortgagee; indeed, the Attorney General reasons that insofar as the mortgagee still has a cause of action under the note to sue the borrower/mortgagor if the property is worth less than the debt, there "would seem to be a clear violation of equal protection rights" because the borrower has no right to seek a refund of overage that the mortgagee receives on the sale. And here in fact the mortgagee did ultimately receive an amount several thousand dollars in excess of the mortgage debt.

■■■ However, absent any suggestion that the foreclosure laws operate to burden a suspect group or fundamental interest, the appropriate standard for analyzing the foreclosure laws under the Equal Protection Clause is whether they are rationally relat-

ed to a conceivable legitimate state interest. *City of New Orleans v. Dukes,* 427 U.S. 297, 303–04, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *see Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (U.S.1979) ("we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational"). In an economic matter such as this, we owe an extraordinary deference to state objectives, almost the equivalent of a strong presumption of constitutionality, and we must uphold any classification based "upon a state of facts that reasonably can be conceived to constitute a distinction, or difference in state policy . . . ." *Allied Stores v. Bowers,* 358 U.S. 522, 530, 79 S.Ct. 437, 443, 3 L.Ed.2d 480 (1959); *see Image Carrier Corp. v. Beame,* 567 F.2d 1197, 1202–03 (2d Cir. 1977), *cert. denied,* 440 U.S. 979, 99 S.Ct. 1785, 60 L.Ed.2d 239 (U.S.1979). The substantive due process test similarly, is whether the laws are rationally related to a legitimate state interest, *Williamson v. Lee Optical Co.,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 99 L.Ed. 563 (1955), though the focus of substantive due process analysis is not whether the State has treated similarly situated classes differently but whether its interest in burdening a *single* class outweighs the due process interests of that class. *See* Note, *Equal Protection: A Closer Look at Closer Scrutiny,* 76 Mich.L.Rev. 771, 831–37 (1978).

■■■ Applying these tests, we hold the Vermont mortgage foreclosure laws constitutional. In the first place strict foreclosure has a long history in the state. At the time of the American Revolution strict foreclosure was the only method of foreclosure recognized by the English chancellors.[17] In the early days a mortgage would

---

**16.** Cases recognized foreclosure by sale provisions in mortgage deeds as cumulative only, *i. e.,* as not excluding a judicial decree of foreclosure. *E. g., Herrick's Adm'r v. Teachout,* 74 Vt. 196, 202, 52 A. 432, 434 (1902). *See also* note 13 *supra.*

**17.** 1 F. Lawrence, *supra* note 9, § 215. According to Lawrence, strict foreclosure continued to prevail in the mother country until the statute of 15 and 16 Vict. (1852) authorized the court to decree a sale. The effect of strict foreclosure was the same as if the mortgagor had

be foreclosed by a bill in equity drawn with all the circumlocution of the English practice so vividly described in Dickens' *Bleak House*. In Vt. Acts 1852 No. 12 the Vermont legislature enacted forms for petition and decree to simplify the proceedings, and until Vermont adopted procedural rules similar to those of the federal rules in 1959 those proceedings followed quite closely a rule of court, Chancery Rule 38, later Rule 39, *regulating the time for redemption. See generally* H. Harmon, *supra.* The procedure has been even further simplified by the unification of law and equity in Vermont when Vermont adopted the federal rules. *See* Vt.R.Civ.P. 80.1 and notes 3 and 4 *supra.*

■ Historical basis does not, of course, alone establish rational relationship, but it does indicate that the people of the state of Vermont have managed fairly well to conduct their commercial affairs despite the allegations of unfairness that can be directed against "strict foreclosure." Property is bought and sold, and mortgages are given and generally paid, if sometimes foreclosed. It has always been open to the courts, as matters of equity, to extend a time for redemption in the event that a property seemed to be more valuable than the debt which it secured, *see Burlington Building & Loan Association v. Cummings,* 112 Vt. 122, 124–25, 22 A.2d 377, 378–79 (1941), or to enlarge or reopen the right of redemption if

the mortgagee accepts payment outside the terms of the redemption order, *Trudeau v. Lussier,* 123 Vt. 358, 365–66, 189 A.2d 529, 535 (1963). Creditors and debtors have worked out numerous accommodations, sometimes without the aid of the courts, sometimes by virtue of court mandate, with little or no apparent dissatisfaction and certainly no challenge on this basis over the years.

But what is that rational relationship? One possible purpose of strict foreclosure is to make it easier for banks or other creditors to lend by giving them a speculative interest in the property, for the bank realizes that it may retain the excess if the property's value happens to exceed the debt. Another purpose might be to compensate the bank for its administrative expense, its employees' time, and its general overhead for any effort involved in a foreclosure suit and subsequent resale. A third possibility is that, in an implicit quid pro quo, the legislature has granted the banks this speculative interest in return for requiring the banks to lend mortgage money at lower interest rates,[18] and to permit prepayment without penalty.[19] Of course, although the favorable interest rates and the nonpenalty provision benefit those who are able to obtain loans, these provisions may also operate as a brake on the volume of mortgage lending in Vermont; but strict foreclosure may mitigate somewhat that

given an absolute deed, operating as payment of the debt either in toto or pro tanto. *Id.* At law formerly the legal estate in mortgaged premises became absolutely vested in the mortgagee upon the mortgagor's default in complying with a condition of the mortgage, but equity stepped in, treating the mortgage as mere security for the debt. *Sowles v. Minot,* 82 Vt. 344, 354, 73 A. 1025, 1029 (1909). Until a decree of foreclosure foreclosing the mortgagor's right to redeem, the mortgagor continued to be the real equitable owner of the fee. Hence, "the equity of redemption" and the former proceeding in equity called the bill to redeem. *See also* notes 8 and 9 *supra.*

18. For many years a bank or other lender was not permitted to charge interest on a mortgage loan in excess of 6%. By virtue of 1967 Vt. Acts No. 377 (Adj.Sess.), the limit was 6½%, effective March 16, 1968, and was amended by

1969 Vt. Acts No. 66, § 1, to 7½%, effective April 17, 1969, which it remained until 1973 Vt. Acts No. 230, § 1 (Adj. Sess.) adjusted it to 8½ %, effective April 3, 1974. Since 1975, 9 Vt. Stat.Ann. § 41(f) has permitted a higher rate on residential real estate mortgages, computed by adding 1¼% to the average of the market yield of certain Treasury bonds and the yield on seasoned corporate bonds, up to a maximum rate of 9¾%. This rate is still lower than the prime commercial rate of more than 11%. It is perhaps not without significance that 1967 Vt. Acts No. 367 (Adj.Sess.), shortening the period of redemption from 12 months to 6 months, and 1967 Vt. Acts No. 377 (Adj.Sess.), limiting mortgage interest rates to 6½%, were both passed on the same day at the close of a legislative session.

19. 9 Vt.Stat.Ann. § 45, added by 1967 Vt. Acts No. 377 (Adj.Sess.).

braking effect and thus may itself indirectly benefit the class of potential mortgagors.

Moreover, perhaps an even more important element of the implicit quid pro quo is that strict foreclosure, as interpreted in Vermont, imposes on banks a substantial delay before they may recover some value for uncollectible debts. To the typical six-month period for redemption[20] one must add two periods of time—from default in payments to the entry of the initial foreclosure decree and from the final decree to the execution of the writ of possession. These may be lengthy, especially in counties, e. g., Addison, whose courts have widely spaced semi-annual terms and long periods of recess or whose courts, e. g., Chittenden, have crowded dockets. These delays certainly diminish the profitability of mortgage lending in Vermont and may in the minds of the legislature help justify an occasional "windfall" benefit to the banks. In the instant case, for example, at least fourteen months elapsed from the time after default that the Bank notified appellant it intended to foreclosure until it actually obtained possession.

Thus, with respect to the distinction between the bank's right to a deficiency and the mortgagor's right to recover a surfeit, the laws do not operate unfairly, in either the equal protection[21] or substantive due process sense. But one might object that the laws create a different kind of unfairness in their differential treatment of mortgagors because they burden only those mortgagors whose property happens to have a value in excess of the outstanding debt. The bank's administrative expenses and losses from uncollectible debts should, one might argue, be collected not from these unfortunate mortgagors, but from the class of mortgagors (or potential mortgagors) generally, in the form of higher interest payments or lesser availability of loans.[22] But this objection is unpersuasive. The legislature may reasonably have concluded that strict foreclosure laws equitably distribute the commercial costs of mortgages because every mortgagor, when he executes a mortgage, is equally subject to the risk that his property's value will exceed the portion of his debt that he is unable to pay. The State's failure to "insure" against the unequal actual *incidence* of this risk by permitting banks to absorb the risk in their interest rates does not amount to a violation of equal protection.

Moreover, to a significant degree mortgagors in the situation of appellant who are burdened by the strict foreclosure laws have in a very real sense brought the misfortune upon themselves because nothing in the law and so far as we can see nothing in fact prevents them from selling the property while the foreclosure is pending; if the property really has an excess value it can be realized by the mortgagor on such a sale. To be sure, conceivably the pendency of a foreclosure proceeding might in some cases operate so as to depress the market for the mortgaged real estate though it is a little difficult to see just how or why unless the mortgagee is the only available lending institution in the particular area. But in this day of several state-wide lending institutions, with easy telephonic communications and ready transportation available, it is difficult to see save in the remotest circumstances how this could be the case. At least one can readily view the legislature as taking the position that to protect those few mortgagors who might be thus adversely affected would not be more desirable than, say, to make mortgage money more readily

20. One commentator has noted that Vermont is unusual among those states having strict foreclosure in providing a long redemption period. G. Osborne, *supra* note 13, § 312 at 652 & n.39.

21. Indeed, the strict foreclosure laws' award of a deficiency to the mortgagee but not to the mortgagor fits awkwardly within the usual framework of equal protection analysis, for it is not obvious in what respect the bank and the borrower are "similarly situated." As the dis-

cussion in the text indicates, the existence of commercial incentives appropriate only to lending institutions reveals that the banks' "situation" differs from their borrowers' and justifies different treatment.

22. Presumably if strict foreclosure were abolished, either one of these two consequences would occur or banks would enjoy lower profits.

available through the strict foreclosure "incentive."

And that is the nub of it. In the ordinary situation a mortgagor will have six months from the entry of a decree (which itself may occur some considerable time after default in payments) within which he can sell his property, and there is nothing that a bank can do to forestall any such sale. Vermont land generally is a marketable, now a highly marketable, commodity. Numerous banks, state and national, as well as savings and loan associations are available for borrowing purposes. Moreover, appellant also had the options of attempting to refinance his loan or of seeking an extension of the redemption period. In light of these several alternatives, the legislature may well suppose that it will only be the extraordinarily recalcitrant debtor who will be injured by strict foreclosure.

Vermont has only recently enacted a statute which permits a power of sale provision to be placed in the contract by negotiation and to be enforced under judicial supervision. See note 2 supra. And perhaps the Vermont legislature will follow the suggestion in the Vermont Attorney General's brief that a mortgagor be permitted to move for a judicial sale even if his mortgage deed does not contain a power of sale provision. This is a matter for the Vermont legislature, however, not for us. We agree with the appellees Bank and Young that the Vermont strict foreclosure law is constitutional under the rational relationship tests above stated.

## IV. CONSTITUTIONALITY OF 12 VT. STAT.ANN. § 4601

The district court held that appellant was barred by collateral estoppel from litigating the constitutionality of 12 Vt.Stat.Ann. § 4601 against the Bank, but not against the State officials, who were not parties to the previous state court actions. It then went on to hold that § 4601, requiring court permission to appeal a judgment for foreclosure, was neither unconstitutionally vague or discriminatory nor a denial of equal protection.

It is true that vis a vis the Bank, appellant did raise the issue of the constitutionality of § 4601 in the state courts. The Superior Court made the simple statement, without any analysis, that "the Court does not find Title 12 § 4601 to be unconstitutional" in its order of January 25, 1977, which required appellant to post a bond in the amount of $5,000 with sufficient surety to indemnify the Bank from all losses or damage by reason of the appeal. The Supreme Court of Vermont, by the simple entry order "appellant's motion to stay judgment is denied, appellee's motion to dismiss appeal granted," must have implicitly upheld the constitutionality of § 4601, because the only basis for the dismissal of the appeal was that appellant, Dieffenbach, had not filed the bond which the Supreme Court had required as a condition for appeal.

■ Although our court for policy reasons has sometimes declined in civil rights cases to give res judicata effect as to constitutional issues which might have been, but were not, litigated in an earlier state court action, *Lombard v. Board of Education,* 502 F.2d 631, 635–37 (2d Cir. 1974), *cert. denied,* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975), our decisions have rather clearly established that where a constitutional issue has been actually raised and determined in the state court and was necessary to that decision, it may not be relitigated in a § 1983 action. *See Ornstein v. Regan,* 574 F.2d 115, 117 (2d Cir. 1978); *Winters v. Lavine,* 574 F.2d 46, 56–58 (2d Cir. 1978). Here, irrespective of the lack of analysis of the constitutional issue in the state court orders, the question of the constitutionality of § 4601 was raised as against the Bank and determined adversely to the appellant, briefly in the Superior Court and by necessary implication in the Vermont Supreme Court. On this basis appellant is collaterally estopped from raising the issue anew in the federal court proceeding. *See Trapeni v. Walker,* 120 Vt. 510, 144 A.2d 831 (1958); *Gilman v. Gilman,* 115 Vt. 49, 51 A.2d 46 (1947).

It makes no difference that the Attorney General of the State (though not the State itself) and the deputy clerk of the Supreme Court are parties to this case and were not parties to the original foreclosure proceeding. Neither the deputy clerk nor the Attorney General played any part in the enforcement of § 4601 against the appellant. (Although the sheriff did execute the writ of possession against plaintiff, the district court dismissed the suit against the sheriff for lack of personal jurisdiction.) Appellant is therefore precluded from relitigating this issue.

## V. CLAIM AGAINST THE DEPUTY CLERK FOR LACK OF NOTICE

Appellant claims that notice of the Bank's motion to dismiss his second appeal in the Vermont Supreme Court for lack of subject matter jurisdiction was inadequate, in violation of his due process rights. This motion was, as we have stated, filed in response to appellant's motion to stay judgment of the foreclosure action. Hearing on appellant's motion had been set for April 29, 1977. On April 27, when the Bank filed its motion to dismiss, the deputy clerk mailed to appellant notice that the two motions would be heard on April 29. Evidently appellant did not receive the notice that the motion to dismiss would be argued on April 29 and he subsequently claimed that he was surprised. We have not been furnished, however, with any material in the record relevant to the hearing in the Vermont Supreme Court other than the Supreme Court's order dated April 29 denying the motion to stay judgment and granting the motion to dismiss the appeal.

▮▮▮ The appellant's failure to secure the permission of the Superior Court judge under 12 Vt.Stat.Ann. § 4601 or to file the bond on which that permission was conditionally granted went to the Vermont Su-

preme Court's appellate jurisdiction. Subject matter jurisdiction is an issue which under the Vermont Rules of Civil Procedure can be raised at any time.[23] Although we have been unable to find any Vermont Supreme Court case expressly permitting the Vermont Supreme Court to dismiss without notice for lack of appellate jurisdiction, its power to do so may be analogized to the power of a trial court to dismiss for lack of subject matter jurisdiction. Vermont Rule of Civil Procedure 12(h)(3) relating thereto is based upon and indeed worded identically to Fed.R.Civ.P. 12(h)(3). And under the federal rules, if a district court tries a case with respect to which jurisdiction is lacking the appellate court may correct the error of the trial court in entertaining the action and itself order dismissal. *Kern v. Standard Oil Co.,* 228 F.2d 699 (8th Cir. 1956). It is quite clear that a question of lack of subject matter jurisdiction may be raised for the first time on appeal in the federal courts. *Choudhry v. Jenkins,* 559 F.2d 1085, 1091 (7th Cir.), *cert. denied,* 434 U.S. 997, 98 S.Ct. 634, 54 L.Ed.2d 491 (1977); *Clarkson Co. v. Shaheen,* 544 F.2d 624 (2d Cir. 1976); *Kern, supra;* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1393 (1969). We see no apparent reason for treating lack of appellate jurisdiction in any different manner, and the court may, on its own motion, dismiss the appeal.

Whatever due process interest appellant may have in not being deprived of his property absent fair judicial procedures is not infringed by this sensible rule permitting the court to dismiss an appeal for lack of subject matter or appellate jurisdiction sua sponte, without a hearing. Notice to a party that he is going to be heard on such an issue is therefore unnecessary. Consequently any inadequacy of notice for such a hearing is wholly immaterial.[24] Of course,

---

**23.** Vt.R.Civ.P. 12(h)(3) provides that "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."

**24.** One might argue that although the Vermont Supreme Court need not grant a party a hearing concerning appellate jurisdiction, once it

*does* determine to grant a hearing it must, as a matter of due process, give advance notice of the hearing. This argument is unconvincing. If a state grants a party procedural guarantees that are not required by due process, then due process is not offended simply because the guarantees are not of the kind that due process would require if it *did* govern.

appellant *did* have the opportunity, albeit without advance notice, to contest the motion to dismiss at the hearing. Even after the hearing, the appellant could have moved for reargument pursuant to Vt.R. App.P. 40. These opportunities were more than sufficient to safeguard appellant's due process rights. Appellant's complaint fails to state a cause of action against the deputy clerk, and it is accordingly unnecessary for us to consider the question whether and to what extent judicial immunity extends to a clerk of court.

We find appellant's other contentions to be without merit.

For the foregoing reasons the judgment of the district court is affirmed.